UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                        **CASE NO. 04-14112**

**FORTUNE  NATURAL**                                          SECTION "B"
**RESOURCES CORPORATION**
Debtor                                                        CHAPTER 11

**MEMORANDUM OPINION**

This matter came before the court as a hearing on the confirmation of the debtor's second

amended plan, with immaterial modifications dated March 10 and March 18, 2005 ("Plan"), and the

objections by Millennium Offshore Group ("Millennium"), Steven B. Rash ("Rash"), Blue Flame

Capital, LLC ("Blue Flame") and Barry W. Blank and the Barry W. Blank Living Trust (collectively

"Blank"), on March 10, 11, 28, 31, April 1, 29, May 6, 19 and 26, 2005.

After the hearing, several additional motions were filed which affect the decision on

confirmation.    Blue Flame filed a motion to withdraw its objection to the Plan,[1] and an order

permitting the withdrawal was entered on June 16, 2005.  Additionally, the debtors filed a motion

to estimate the post-petition reduction of Blank's proof of claim.[2]  This motion essentially requests

that Blank's proof of claim in the amount of $1,962,981.51 be reduced by post-petition adequate

protection payments.  Blank has also filed a motion for approval of oversecured creditor's attorney's

fees, costs and expenses.[3]  This motion seeks to determine the amount and allowance of post-petition

---

[1]  P. 992.

[2]  P. 975.

[3]  P. 987.

-1-

interest and attorney's fees of $461,008.79.  Blank contends that with attorney's fees, its claims exceed $1.9 million.   This motion has not yet been heard and decided.

## I.  Background

A.  <u>History of the debtor</u>.

Fortune is an oil and gas exploration company.  It has as its primary assets i)  interests in two exploration programs known as the Exxon Program and the Newton County Dewey Stringer Program; ii) interests in certain producing oil and gas wells located primarily in Texas; iii) interests in the Espiritu Santo Bay seismic data and program; and iv) interests in non-producing oil and gas leases.  The debtor also possesses a net operating loss carryforward ("NOL") of over $25,000,000. The debtor filed its voluntary petition for Chapter 11 relief on June 1, 2004.  At the time of the filing, Fortune was in default of certain payments necessary to preserve valued oil and gas interests, had not paid its employees, and the only one left to run the company was a member of its board of directors.

B.  <u>The Debtor's Plan</u>.

Fortune filed its Plan within the exclusive period.  The Plan is based upon a compromise with EnerQuest Oil and Gas, LLC ("EnerQuest"), a pre- and post-petition creditor of the debtor, and with the Unsecured Creditors Committee ("UCC").   The Plan provides for the debtor's assets to be divided into two companies: New Fortune[4] and Reorganized Fortune.  EnerQuest will own approximately 35% of New Fortune, and EnerQuest will exchange its Class 1 claim, settled at $8,000,000, for 100% of the common stock of Reorganized Fortune.

Reorganized Fortune will retain title to properties known as the "Existing Properties"

---

[4]  The newly formed company will be named "Endure Energy, Inc."

consisting largely of properties which secure the objecting party's claims. These properties include the AWP, LaRocca, South Timbalier Block 76 ("ST 76"), and certain properties operated by Prime Operating Co. ("Prime"). It also includes certain other properties known as the Bay Marchand, Sanders, Denius and Cook, if pledged to Blank. If not pledged to Blank, Reorganized Fortune will include only 50% of these properties, and the rest will belong to New Fortune.

New Fortune will receive the debtor's other properties, including the exploration property and the seismic data. Creditors other than the objecting creditors will receive payments from New Fortune. Unsecured creditors who elected to convert debt to equity will also receive shares of Class A stock in New Fortune. EnerQuest will provide both cash and non-cash benefits to New Fortune. The cash contribution consists of a capital contribution of $2,404,973.23, less the amount of the DIP loan by EnerQuest, which had a balance of approximately $1,465,252.01, as of March 1, 2005. The non-cash contributions include contract operating and management services to New Fortune, as well as a standby loan commitment for expenses, other than drilling expenses, on the exploration programs; a back-in interest in new wells drilled; and other interests.

The objecting creditors are classified as Class 2(a) secured creditors under the Plan. The Plan provides that the Class 2(a) creditors are entitled to receive the Existing Properties Net Cash Flow generated by the Existing Properties subject to their liens, with interest, in payment of their claims. Class 2(a) creditors will retain liens on collateral until paid in full, and have the right to foreclose on their collateral should Reorganized Fortune default in payments. The Plan calls for minimum payments to be made to Class 2(a) creditors for a period of sixty months, and a balloon payment thereafter if the claims are not paid in full. If the debtor defaults on any annual payment or the final payment, and the default is not cured, Class 2(a) creditors have the right to foreclose or

execute upon the liens securing their claims *in rem* in either state or federal court.

    C.  Objecting Parties' Secured Claims.

    Blank has two secured claims in this proceeding.  One claim stems from a prepetition loan

by the  Barry W. Blank Living Trust to Fortune in the amount of $2,058,121.93 to pay off Fortune's

prior debt to EnerQuest.  The EnerQuest loan was in the amount of approximately $1.4 million, and

bore 12% interest, secured by mortgages and deeds of trust on certain of Fortune's properties.  On

August 4, 2003, EnerQuest sold the notes, mortgages and deeds of trust securing its claim to the

Blank trust.  The note evidencing the loan was a short term note maturing on February 4, 2004,

bearing interest at 10%.  Blank has filed a proof of claim in this proceeding asserting that, on the

petition date, its claim was in the amount of $1,981,384.68.[5]  This claim is secured by existing wells

of Fortune, as well as wells to be drilled by Fortune, and includes Fortune's interest in the AWP

wells,[6] the LaRocca wells,[7] South Timbalier Block 76,[8] the  Prime wells,[9] and certain properties in

Mississippi.

    On June 28, 2005, this court granted the debtor's motion to determine or estimate the post-

---

[5]  Claim No. 56.

[6]  These are wells located in McMullen County, Texas operated by AWP Operating.

[7]  The La Rocca wells are located in the La Rosa fields in Refugio County, Texas and
operated by LaRocca LLP.

[8]  ST76 is located offshore Louisiana and operated by Millennium Offshore Group.

[9]  The Prime wells include: (I) wells located in Walker County, Texas and operated by
Prime Operating Company, including the Gibbs Gas Unit #1 Well, the Parker Unit #1 well, and
wells on the Moneywort prospect; (ii) wells located in Polk County, Texas and operated by
Prime including the Cook Unit #1 well, Denius Gas Unit #1 well, the IP#1 well, the Pedigo #1
well, the Peebles Unit #1 well, Sanders Unit #1 well, Stephens #1 well, Wilkerson #1 well,
Blackstone Unit #1 well and McClenndon Unit #1.

petition reduction of Blank's proof of claim, and an order was entered on July 14, 2005 recognizing that the post-petition adequate protection payments made to Blank in the amount of $459,539.95, reduced the amount of pre-petition interest and principal of the claim to a total of $1,437,611.91. This amount does not include post-petition interest which accrues on the claim, attorney's fees or post-confirmation interest on the claim.

In addition, Barry W. Blank individually loaned the Debtor the sum of $25,000 evidenced by a promissory note dated February 19, 2002, secured by Fortune's property located in the Cadiz field in Bee County, Texas.[10]

Millennium has filed several claims in connection with these proceedings.[11] The claims are for amounts Millennium claims it is owed by Fortune for joint interest billings on leases where the parties are co-lessees, and certain postpetition operating expenses. Additionally, Millennium claims a cure payment for Fortune's share of plug and abandonment costs from the South Timbalier 76 field wells. All of Millennium's claims have been objected to by the debtor, and the court has disallowed each of Millennium's claims.[12] As such, Millennium lacks a prepetition claim against the debtor, and is not treated as a creditor under the Plan. At best, Millennium is a party in interest, due to its interest as operator and co-lessee in oil and gas leases with the debtor. Nevertheless, it participated

---

[10] Blank's claims include claim no. 41 filed Sept. 20, 2004 as a secured claim in the mount of $1,981,384.68 and claim no. 55, filed Dec. 22, 2004 as a secured claim in the amount of $24,169.75.

[11] Millennium's claims include claim no. 54 filed Dec. 22, 2004 as a secured claim in the amount of $107,138.50, claim no. 67 filed Feb. 28, 2005 as a secured claim in the amount of $95,308.56 and $92,929.25 as a priority unsecured claim, and claim no. 68 filed March 2, 2005 as a secured claim in the amount of $75,326.46 and an unsecured priority claim in the amount of $29,546.82.

[12] P. 830, 933.

fully and opposed strenuously debtor's plan of reorganization.[13]

Mr. Rash has filed an unsecured priority claim in the amount of $4925.00 for wages, salaries or commissions due by the debtor under §507(a)(3).[14]   Priority claims are included in Class 3 of the Plan, and are unimpaired and will be paid in full in cash.[15]

.                              **II.  Motion to Value Security**

On February 17, 2005, the debtor filed a motion to value security under Bankruptcy Rule 3012.  The motion seeks to value the Existing Properties which will be used to pay Class 2(a) creditors, including Blank, to determine whether sufficient value exists in the properties to pay the secured claims in full as provided in the Plan.  Specifically, the debtor seeks a finding that the value of the Existing Properties and the present value of the Net Cash Flows received from the Existing Properties exceeds the estimated aggregate amount of Class 2(a) claims, so that these claims may be deemed to be fully secured under the Plan.  Both Blank and Blue Flame filed objections to the motion to value.

The motion to value specifically is limited to the question of whether the Existing Properties under the plan has sufficient value so that Class 2(a) claims are fully secured.   At the hearing on the matter and in its objection to the motion to value, Blank has stipulated that "the value of the collateral securing the claim of Blank is measurable in at least the amount of Blank's Claim,

---

[13]   Debtor offered early in the trial to pay its share of the plug and abandonment cost into escrow if Millennium would do the same.  Debtor actually wired over $104,000 to be held in escrow by one of the debtor's attorneys pending acceptance by Millennium of the debtor's offer. Millennium, for its own reasons, refused the offer and continued to press its objections to the Plan.

[14]   Claim no. 43, filed Nov. 29, 2004.

[15]   Plan Art. 5.1.

including, accrued interest pre- and post-petition, attorneys' fees, and costs and expenses as may be charged, provided that (i) Blank holds a first lien in, to and upon said collateral, and (ii) the treatment afforded Blank through a confirmed Plan provides for the payment of Blank's Claim, in full." This stipulation was qualified and without prejudice to Blank's right, *inter alia,* to contest the reserve reports offered by the debtor, and whether the collateral securing Blank's claim would produce sufficient cash flow to pay the claim.

The debtor contends that the value of the Existing Properties greatly exceeds the aggregate balance due to all Class 2(a) claimants and the net present cash flows from proven reserves are adequate to pay all Class 2(a) claims in full. Blank contends that the proved producing and proved behind pipe reserves from the Existing Properties will not generate sufficient cash flow to pay even Blank's claims, and that these reserves deplete at a rate of 30% per year. Blank asserts that the proved producing reserves from all properties pledged to Blank, less the reserves attributable to the Saunders, Cook and Denius wells that the debtor has asserted belong to New Fortune, total only $1,388,272.00, which is less than the amount due Blank, even before considering certain reductions contained in the Plan, such as a 3% management charge and deductions for plug and abandonment costs.[16] Given the stipulation, the court will treat Blank's claim as fully secured for purposes of confirmation.

### III. Reserve Reports and Cash Flow Analysis

In this case, the court is dealing with producing and nonproducing oil and gas properties. The Plan provides for Net Cash Flow from the Existing Properties to be used to pay Class 2(a)

---

[16] P. 984, p.9-10.

claims.  Although Blank has stipulated  to treatment of its claim as fully secured, it argues that the

Net Cash Flow generated by wells on the collateral securing its claim are insufficient to pay its

claim, that the Plan is not feasible and does not meet cram down requirements as a result.


   **A.  Reserve Reports**.

   The court received various expert reserve reports and testimony providing an analysis of the

production value of the Existing Properties.  This evidence show the following:

   1. *Huddleston Report*.        Huddleston & Co., Inc. prepared for Fortune an estimate of

future reserves and revenues as of January 1, 2005.[17]  The Huddleston report provides a summary

of the Bay Marchand Block 5, South Timbalier Block 76, Bacon Field, AWP Field, Cadiz and La

Rosa Fields, properties located in Mississippi, Texas and Louisiana, and includes property not

subject to Blank's security interests and deeds of trust.  The projected reserves and revenues by year,

without being discounted for risk, as contained in the Huddleston letter of November 22, 2004,[18] are

as follows:

|  | Net to Fortune Natural Resources Corporation | | | |
|---|---|---|---|---|
| Projected Reserves and Revenues by Year Estimated Net Revenues, $ | Proved Dev'd Producing | Proved Behind Pipe | Proved Undeveloped | Total Proved |
| 2005 | 510,105 | 60,421 | (49,042) | 521,484 |
| 2006 | 295,073 | 96,865 | 39,202 | 431,139 |
| 2007 | 153,565 | 39,749 | (207,047) | (13,732) |
| Thereafter | 108,868 | 704,997 | 5,655,142 | 6,469,007 |
| Total | 1,067,611 | 902,032 | 5,438,255 | 7,407,898 |

---

   [17]  Exhibits D- 2, 3.

   [18]  Exhibit D-2.

If broken down even further, the Huddleston report indicates that an estimate of the proved

producing reserves and revenues, discounted for risk at 10% and net of operating expenses, taxes

and other costs, as of January 1, 2005 to be in the total amount of $871,932.00[19] for the period 2005

to 2021.[20]

Mr. Floyd, a reservoir engineer for Huddleston, testified that the proved undeveloped figure

largely represents two properties: the Bracken Ranch well and the ST 76 sidetrack well, both of

which had not been drilled as of the confirmation hearing.   The Bracken Ranch well is projected

to begin producing in 2005 and produce approximately $50,530.[21]  By far the largest component of

the proved undeveloped category is the ST 76 sidetrack well, which is projected to begin producing

in 2007, ultimately with $3,040,611 of production value.[22]

2.  *Rick Marshall Report*.        The court also received an estimate of reserves, future

production and income as of January 1, 2005 from Eldorado Engineering, Rick Marshall, P.E.[23] for

the debtor's properties located in Polk and Walker Counties, Texas.  As Mr. Marshall testified, the

report covers properties operated by Prime, including those which are subject to Blank's security

---

[19]   Mr. Floyd testified that tables computed for the AWP, Bacon and LaRosa fields failed
to deduct severance taxes, and the figures in the final figure are slightly lower than those
previously computed in the report due to the error.  Mr. Floyd testified that  $871,932
represented the correct total proved producing figure after deduction of a 10% discount factor for
risk.

[20]   Exhibit D-3, pg. 55.

[21]   Exhibit D-2, pg. 32.

[22]   Exhibit D-2, pg. 14.

[23]   Exhibit D-6.

interest, in Texas.[24]   The report's conclusion is that proved producing gas reserves existed of

136.379 millions of cubic feet (MMCF), with future gross revenue of $872,717, deductions of

$132,125, yielding future net income of $740,592.  The discounted future net income, with a 10%

discount (PV10) resulted in $669,871 in proved developed future income.

As testified to by Mr. Marshall, a reservoir engineer, the figures assume that salvage and

plug and abandonment costs for wells contained in the report will offset each other, and therefore

plug and abandonment costs are not deducted from the revenue figures.  He also testified that the

wells contained in the report were shallow wells with a short life, and that they could be expected

to have approximately four years or less of productive life remaining, depending upon the well.

3.  *DeGolyer and MacNaughton Report*.  Also in evidence is the appraisal report of

the debtors interest in the South Timbalier Block 76 field as of December 31, 2004, prepared for

Millennium Offshore Group.[25]  The report summary concludes that the net reserves are as follows:

|                 | Proved Developed Producing | Probable* | Possible* |
|-----------------|:--------------------------:|:---------:|:---------:|
| Oil, Mbbl       | 1                          | 5         | 0         |
| Sales Gas, Mmcf | 21                         | 80        | 0         |

The estimate of revenue and costs attributable to Fortune's interests in the proved and

proved-plus-probable reserves is expressed in the following chart:

|                          | Proved Developed Producing | Proved Plus Probable* |
|--------------------------|:--------------------------:|:---------------------:|
| Future Gross Revenue, M$ | 213                        | 918                   |
| Operating Expenses, M$   | 108                        | 445                   |
| Capital Costs, M$        | 103                        | 378                   |

---

[24]  Mr. Marshall testified that the properties included the Hobble, Yarrow and Pepper Bush fields.

[25]  Millennium 56.

-10-

| | | |
|---|---|---|
| Future Net Revenue**, M$ | 2 | 95 |
| Present Worth at 10%**, M$ | 7 | 90 |

> \* not adjusted for risk
> \*\* excluding future income taxes

## B. Cash Flow Projections

At trial, the debtor introduced a projection of future cash flows to be used to pay objectors' claims.[26]  The cash flow projections are based upon the Huddleston and Rick Marshall reserve reports, and provide a total of revenues from the debtor's properties based upon the proved producing, proved behind pipe and proved undeveloped reserves.  It provides a separate table that excludes certain properties not subject to Blank's security interests, i.e., the Bay Marchand, Cadiz, Cook, Denius and Sanders properties, and specifies that the cash flow available in the years 2005 to 2010  to pay Blank is as follows:

| | |
|---|---|
| 2005 | $ 864,297 |
| 2006 | $ 606,599 |
| 2007 | $  46,961 |
| 2008 | $1,565,441 |
| 2009 | $1,167,432 |
| 2010 | $ 865,041 |

The last part of the cash flow analysis is a payment schedule, which indicates that if the minimum payments called for under the Plan are made, that Blank's claim, including accrued interest, will be paid in full in the fifth year after confirmation.

This analysis was further refined by Mr. Lacoff for the debtor, with a risk-adjusted cash flow projection that applies a discount factor to the proved behind pipe and proved undeveloped categories of revenue and uses a present value adjustment of 8.5%, which is the interest rate being

---

[26] Exhibit D-25.

paid on  Class 2(a) claims in the Plan.[27]  Under this analysis, the risk-adjusted revenue stream

available to pay Blank in the years 2005 to 2010, or the life of the Plan, are as follows:

|  | Proved Producing | 65% Behind Pipe | 57.5% Undeveloped | Rick Marshall Proved Producing |
|---|---|---|---|---|
| 2005 | $480,395 | $39,274 | -28,199 | $412,943 |
| 2006 | $272,092 | $62,962 | 22,541 | $209,376 |
| 2007 | $138,106 | $33,944 | -119,052 | $ 91,484 |
| 2008 | $ 79,222 | $31,833 | 873,855 | $ 23,916 |
| 2009 | $ 34,378 | $22,972 | 628,044 | $ 2,872 |
| 2010 | $ 8,570 | $16,787 | 477,562 | - |
| PV8.5% | $867,295 | $164,792 | $1,240,899 | $649,239 |

Blank's evidence and arguments to the contrary are dealt with later in this opinion, at page 15.

## IV.  Confirmation Issues

Blank's objections to confirmation fall into several categories.  Many of the objections have

been satisfied by modifications to the Plan that either change or clarify definitions used in the Plan,

or alter payment procedures.  Broadly classified, Blank's remaining objections to the Plan are as

follows: (i)  the Plan is not fair and equitable and violates §1129(a)(3); (ii) the Plan does not pay

Blank as much as it would receive in a chapter 7 liquidation and violates §1129(a)(7); (iii) the Plan

is not feasible and violates §1129(a)(11); and (iv) the Plan is not fair and equitable and violates

§1129(b)(2) with respect to Blank's secured claims.

A.  The Cram Down Standards.

Blank asserts that the Plan does not meet cram down standards found in §1129(b)(2) and

cannot be confirmed.  Section 1129(b)(1) provides that a plan, in order to be confirmed as to a

nonaccepting impaired class such as Blank,  must not discriminate unfairly and must be fair and

---

[27]  Exhibit D-14.

equitable to each nonaccepting impaired class. Among other things, Blank alleges that the Plan does not provide Blank with deferred cash payments equal to the secured value of his claims, fails to provide the indubitable equivalent of his secured claims and impermissibly alters the substance of his claims, impermissible converts Blank's recourse claim to a nonrecourse claim, does not permit the exercise of state law foreclosure rights Blank previously had and fails to pay Blank under commercially reasonable terms.

1. **Fair and equitable.**

"The 'fair and equitable' requirement provides for an absolute rule of priority among creditors and stockholders in reorganization plans, placing secured creditors' rights first, those of unsecured next, and subordinating the interests of stockholders."[28] The Code defines treatment that is fair and equitable to various classes of claims. For secured creditors, such as the objecting Class 2(a) creditors, fair and equitable means:

> (A) With respect to a class of secured claims, the plan provides–
> (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>    . . .
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.[29]

Where the debtor proposes to retain collateral securing a claim, §1129(b)(2) dictates that

---

[28] *In re Lakeside Global II. Ltd.,* 116 B.R. 499, 511 (Bankr. S.D. Tex. 1989).

[29] 11 USC 1129(b)(1), (2).

the secured claimant must retain its lien on the collateral and receive cash payments equal to the present value of the allowed amount of the secured claim or otherwise receive the "indubitable equivalent" of its secured claim.[30]   In this context, valuation is determined as of the effective date of the debtor's plan.[31]

(a) **Deferred cash payments**.

Blank has filed two proofs of claim asserting two secured claims with original principal balances on the petition date of $1,897,151.84 and $24,169.75, plus interest and attorneys fees.  The parties agree that Blank has received a total of $459,539.95 in adequate protection payments during the course of the bankruptcy proceedings which reduce the principal balance of his prepetition claim to $1,437,611.91.   Blank contends that with the claimed - but not yet awarded - attorney's fees of $461,008.79,  the amount is over $1.9 million.

It is clear to the court that  the total of the debtor's proved producing properties generate insufficient cash flow to pay Blank's claim.[32]  Mr. Lacoff has prepared a projected cash flow for payments under the Plan to Class 2(a) creditors extrapolated from the debtor's reserve reports.[33]  The analysis provides a summary of revenue sources for payments to be made under the Plan from Existing Properties to Class 2(a) creditors.  The projected cash flow includes revenues denominated

---

[30]   11 U.S.C. 1129(B)(2)(A)(i), (iii).

[31]   *In re Methvin*, 11 B.R. 556, 557 (Bankr. S.D. Miss. 1981), *aff'd* 31 BR. 569 (S.D. Miss. 1982).

[32]   Post-petition production of $459,539.95 has already been paid to Blank as adequate protection.   To the extent that production has already occurred, it should be deducted from the future revenue projections of the debtor, which are based on reserves of January 1, 2005.

[33]   Exhibit D-25.  The cash flow fails to take into account adequate protection payments subsequently made to Blank, which also would reduce future cash flow reflected in the report.

as proved producing in the total amount of $1,860,659, proved behind pipe revenues of $902,030, and proved undeveloped reserves of $5,438,253.00, for a grand total of nearly $8 million in projected future revenue.  This figure, however, is unrisked, and has not been discounted for risks associated with the future development of speculative properties.  Moreover, the proved producing amounts contains a revenue stream from wells that are not included in Blank's collateral.  After deducting revenues generated from property excluded from Existing Properties, such as the Bay Marchand, Cadiz, Cook, Denius and Sanders properties, the cash flow available to pay Blank according to the debtor's calculations are in the following amounts for the years 2005 to 2009[34]:

|  |  |
|---|---|
| 2005 | $   864,297 |
| 2006 | $   606,599 |
| 2007 | $     46,961 |
| 2008 | $1,565,441 |
| 2009 | $1,167,432 |
| Total | $4,250,730 |

Blank asserts that the figures are lower than those projected by the debtor.  He contends that when one properly considers only the income from the  properties to which his mortgages attach - the AWP, LaRosa, Prime, ST76 and Bacon properties - the figures for the same period total $1,388,272 and are as follows[35]:

|  |  |
|---|---|
| 2005 | $818,606 |
| 2006 | $402,467 |
| 2007 | $170,428 |
| 2008 | $ 66,555 |
| 2009 | $ 21,935 |
| Subtotal | $1,479,991 |
| Less: New Fortune | (91,719) |
| Total Pr'd Producing | $1,388,272 |

---

[34]  Exhibit D-25, pg.2.

[35]  P. 984, pg. 10.

The Lacoff cash flow analysis[36] provides that approximately $1,470,896 in future revenue from 2005 to 2006, the time frame prior to the drilling of the ST 76 sidetrack well, are available to pay Blank's claims.  The debtor's  risk adjusted and discounted figures project that from 2005 to 2010, the term of the Plan, a total of $1,516,534 is available to pay Class 2(a) creditors from proved developed reserves.[37]

 As testified at trial by Mr. Floyd, the Huddleston reservoir engineer, and Mr. Olsen, the majority owner of EnerQuest, the Huddleston reserve report does not deduct costs of plug and abandonment obligations of the debtor, in the approximate amount of $200,000,  nor does it deduct the 3% administrative fee to be charged by EnerQuest under the Plan for operating the properties. It also does not include any costs that EnerQuest may seek to be paid under the terms of the Plan for drilling and other costs.[38]  Once these figures are considered, the figures used in the debtor's cash flow analysis must be further reduced.  The net result of such reductions is that cash flow from proved producing properties, the properties where production is currently realized by the debtor, is insufficient to pay Blank.[39]

In order to pay the full value of Blank's secured claim, the debtor must rely upon proved

---

[36]  Exhibit D-25.

[37]  Exhibit D-14.

[38]  Mr. Olsen, the majority owner of EnerQuest, testified that under the Plan, EnerQuest would be repaid its capital costs before payment of Blank's secured claim.  Under the Plan, Reorganized Fortune would fund EnerQuest's expenses to drill, and EnerQuest would be repaid what it advanced before the secured creditors were paid.  Testimony, Mr. Olsen, May 5, 2005.

[39]  The 3% administrative fee would be approximately $25,929 in 2005 ($864,297 x .03) and $18,198 in 2006 ($606,599 x .03).

behind pipe and proved undeveloped reserves.  These reserves are more speculative, as they represent properties or revenue streams not currently in production, or which have not yet been drilled.  For that reason, a sizeable discount factor is applied to each of these categories of revenue, to account for the risk involved in achieving future production from these sources.[40] The Huddleston report shows the total of proved behind pipe revenues from 2005 to 2024 to be in the amount of $902,030.  The Plan proposes to pay Class 2(a) creditors on the earliest of the date the properties cease to producing commercial quantities;  60 months; or the time the claim is paid in full.   By and large, the five-year payment period also coincides with the economic life of a large part of the debtor's current producing properties.  The total provided behind pipe figure for 2005 to 2010 equals $292,168.  The Huddleston figure includes some amounts that are from fields not subject to Blank's security interest, and also is not risked. According to the debtor's own calculations, the risk-adjusted figure for proved behind pipe resources for the same period equals $164,792.00.[41]  This figure, while close, is still not sufficient to pay Blank's claim in full, especially if the court considers that the revenue figures do not include deductions for the 3% administrative overhead charge under the Plan, and does not include plug and abandonment charges.[42]

The largest component of the proved undeveloped reserves as contained in the Huddleston report is from the ST 76 sidetrack well, which the debtor proposes to drill.  Because the proved

---

[40]  Testimony Mr. Floyd, Exhibit D-14.

[41]  Exhibit D-14.

[42]  The Plan provides that the claims of  Class 2(a) creditors will accrue and be paid interest at the Market Rate, which is prime plus 300 basis points.  The debtor asserts that prior to commencement of the confirmation hearing, the prime rate was 5.5%, making the Market Rate under the Plan 8.5%.  P. 983, pg. 25.

developed and behind pipe reserves are insufficient to pay the claim in full, the court is left with the inescapable conclusion that the Plan, as it relates to payment of Class 2(a) creditors, depends upon the successful completion of the ST 76 sidetrack well, and realization of revenues from that well. A great amount of time and evidence in this nine-day confirmation hearing revolved around this well. The court heard testimony, which it finds to be credible, that a significant risk is associated with the drilling of the ST 76 sidetrack well, which provides nearly all of the future revenue in the proved undeveloped category of the Huddleston reserve report, and used in the debtor's cash flow calculations.

First, the ST 76 sidetrack well cannot be drilled until production in commercial quantities from the currently producing A-1 sand ceases, and this period cannot be definitively determined.[43] Second, the court also learned from the testimony of Mr. Singleton, a principal of Millennium, the operator and majority owner of the ST 76 lease, that Millennium would not propose or drill the ST 76 sidetrack well.[44] If Millennium does not drill the well, a significant legal question exists whether Fortune could, under the terms of its operating agreement with Millennium, successfully proceed with the drilling of the ST 76 sidetrack well.[45]

Third, the court heard expert testimony regarding the difficulties that would be encountered in drilling the sidetrack well, which it found to be credible. The testimony of Mr. Jeffery R. Hughes, a petroleum and drilling engineer called by Blank, was that the ST 76 well contained three packers, and that it would be difficult and economically unfeasible to drill out all three packers, which would

---

[43] Testimony Mr. Mollman, March 31, 2005.

[44] Testimony Mr. Singleton, April 29, 2005.

[45] *Id.*

-18-

be required before the ST 76  sidetrack well could be drilled.[46]  This was also the testimony of Mr. Singer, an expert in the field of petroleum engineering, who stated that he would not drill the sidetrack because the tubing and packers involved would require excessive time and money.[47]

Testimony was also heard that the actual cost to drill the sidetrack well would likely greatly exceed Fortune's estimate of the drilling costs.  Mr. Floyd testified that the Huddleston reserve report used Fortune's estimate of $250,000 for its share of costs, or $2,000,000 in gross costs, to drill the sidetrack well.  Mr. Hughes, however, estimated the total cost of the sidetrack to be closer to $5.5 million.  Mr. Singer placed the cost of drilling the sidetrack well at closer to $14 to $15 million.[48]  In Mr. Singer's opinion, the sidetrack well could not successfully be drilled due to drilling problems encountered. If the costs to drill are higher than the debtor projects, the project may well become economically unfeasible.

The debtor's rebuttal evidence consisted of an explanation by Mr. Mollman that bringing the sidetrack well to completion would not be as difficult or expensive as was described by the expert witnesses for Blank and Millennium.  The court recognizes that Mr. Mollman is a skilled, bright young petroleum engineer but when his skills and experience are weighted against those of Mr. Singer and Mr. Hughes it comes up short of carrying the burden of proof that falls on the debtor in this case.  The court must note that:

1. Mr. Mollman is an owner of Enerquest and thus has a vital stake in the outcome of this confirmation hearing.  Although the court recognized him as an expert (and is convinced that this

---

[46]  Testimony Mr. Hughes, May 5, 2005.

[47]  Testimony Mr. Singer, March 30, 2005.

[48]  Testimony Mr. Singer, April 29, 2005.

was proper despite his interest in this case) it cannot escape thinking that his wishful hopes of success may have influenced his testimony that there were facile solutions to the problems described by the other expert witnesses.

2. Mr. Mollman has no experience as a drilling supervisor in the Gulf of Mexico.

On balance, the court must conclude that the debtor has not carried its burden of proving that drilling the sidetrack well on ST 76 is feasible.  For all of the reasons stated above, the court finds that the Plan does not provide Class 2(a) objecting creditors with deferred cash payments of at least the allowed amount of such claim with a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

(b) **The indubitable equivalent**.

Section 1129(b)(2)(A) provides that in order for a plan to be fair and equitable to a class of secured claims where the debtor proposes to retain property, the Plan must either provide deferred cash payments or "for the realization by such holders of the indubitable equivalent of such claims." Case law provides that the abandonment or unqualified transfer of property to the secured creditor satisfies the indubitable equivalence standard;[49] however, a stream of payments with a present value of less than the allowed amount of the claim will not.[50]  The Plan in this case does not propose to transfer the property securing Blank's claim to it, and also does not provide a stream of payments sufficient to pay the claim.  Instead, in this case, a real doubt exists as to whether Blank will be paid in full under the terms of the Plan.   The payments under the Plan do not satisfy the "indubitable equivalent" standard.   As discussed previously, the projected maximum revenue to be received by

---

[49]  *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1350 (5th Cir. 1989).

[50]  7 Collier on Bankruptcy, para.1129.05[2][c], *citing* 124 Cong. Rec. 32,407 (1978).

the debtor on Existing Property, based upon the debtor's reserve and cash flow analysis, is insufficient to pay Blank's claim in full.

The Plan provides for certain minimum payments, as follows: $432,148.50 for the first year, $303,299.50 the second, $23,480.50 the third, $1,095,808.70 the fourth and $2,188,181 the fifth year of the Plan.  The rise in payments in the fourth year reflects the debtor's expectation that the ST 76 sidetrack well will be drilled and will produce in paying quantities.  Absent income from this new drilling activity, the Plan fails to provide sufficient minimum payments to satisfy even half of Blank's claim, forcing Blank to await the drilling of the speculative ST 76 sidetrack well.  If that well is not successfully completed - and substantial evidence exists that innumerable problems are likely to be incurred that will prevent the realization of production - then Blank can, at the end of the fourth year, institute *in rem* foreclosure procedures, if the default in payment is not cured by Fortune.  The after-acquired property and interest clause in Blank's original deeds of trust and mortgages are not part of the Plan, foreclosing Blank from receiving a lien of future wells drilled under the exploration program.

Blank is given only limited remedies under the Plan in the event of default, limited to an *in rem* foreclosure procedure, which may occur at the end of the fourth year of the Plan, and loss of certain other beneficial provisions contained in his original deeds of trusts and mortgages.  Blank cannot institute non-judicial foreclosure proceedings, and must wait until a year has run before declaring a default.  Such cannot be said to constitute the indubitable equivalent of Blank's claim.

The minimum payments called for in the Plan provide less income to Blank than he is receiving now as adequate protection payments.  Only if a speculative well is drilled and produces will there be sufficient income to make the final balloon payment to pay Blank, and Blank will be

-21-

delayed in foreclosing for four years while this outcome is determined. Blank can then choose to foreclose on properties that are not producing, or producing only in minimal quantities. This is not the equivalent of full payment, and fails to satisfy the indubitable equivalence standard of §1129(b)(2)(A)(iii).

(c) **Risk Shifting**.

Courts have also read the "fair and equitable" requirement of §1129(b) to prohibit the unfair and unreasonable shifting of risk related to the reorganized debtor's financial and operational performance.[51] A plan that shifts the risk of failure from a junior class, to a dissenting senior class, may violate the fair and equitable standard. In this case, the Plan provides that payment to Blank, as a Class 2(a) creditor, depends in large part upon the successful drilling of the ST 76 sidetrack well. Prior to payment of Blank's claim, the funds to drill this well will be recouped by EnerQuest from revenue generated from properties that secured the Blank claim, thus placing the risk of successful completion of the well upon Blank. Blank, however, is not given the benefit of the appreciation in the debtor's property if the well should be successfully completed. Thus, the downside risk falls on Blank but any upside gain goes to Reorganized Fortune.

The Plan bases payment of Class 2(a) creditors upon a speculative income stream to be generated in the future, in large part upon a well that has not yet been drilled, and which may never be drilled due to legal, financial and operational difficulties in drilling the ST 76 sidetrack well. Revenue projections from producing wells show that insufficient future revenue exists to pay the claim in full. Instead, Blank is forced to rely upon projections of revenue from behind pipe and

---

[51] *In re D& F Constr., Inc*, 865 F.2d 673, 675 (5th Cir. 1989); *see also In re Monarch Beach Venture, Ltd.*, 166 B.R. 428, 436 (C.D. Cal. 1993).

undeveloped sources, or more risky prospects, to realize payment of its claim. If the debtor undertakes the drilling of the ST 76, and it fails, not only will there be insufficient revenues under the Plan to pay creditors, the revenue that is projected to exist will be diverted to pay the costs of drilling, and not payment of creditors claims.

B.  **Feasibility under §1129(a)(11).**

Section 1129 provides that:

(a) The court shall confirm a plan only if all of the following requirements are met:
. . .

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[52]

This portion of §1129(a)(11) requires, in simple terms, that for a plan to be confirmed, it must be "feasible."[53]  The debtor must prove a plan's feasibility by a preponderance of the evidence.[54]  A plan is feasible where it offers "'a reasonable probability of success,'"[55] and where "the debtor can realistically carry out its plan."[56]

In proving a reasonable probability of success, the bankruptcy court "need not require a guarantee of success. . . ., [o]nly a reasonable assurance of commercial viability is required."[57]  In

---

[52]  11 U.S.C. 1129(a)(11).

[53]  *T-H New Orleans Ltd. Partnership*, 116 F.3d 790, 801 (5th Cir. 1997).

[54]  *Id.*

[55]  *Id, citing In re Landing Assoc., Ltd*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993).

[56]  *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989).

[57]  *T-H New Orleans*, 116 F.3d at 801 (citations omitted).

*T-H New Orleans Limited Partnership*, feasibility was shown where the debtor demonstrated that it was able to service the debt with an infusion of capital, and presented evidence regarding the past and present earning power of the debtor, the ability of management and the economic picture for similar businesses in the area.[58]  Projections of future revenue are appropriate "where the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive."[59]

The feasibility standard requires that the plan proponent show concrete evidence that it has sufficient cash flow to fund and maintain both its operations and obligations under the plan.[60]  In this case, after hearing the testimony of witnesses and reviewing the documentary evidence, the court finds that the debtor has failed to prove by a preponderance of evidence that the Plan is feasible.  First, the court notes that the debtor's revenue projections provide that a stream of revenue to be generated from Existing Properties be used to satisfy the claims of secured Class 2(a) creditors, such as Blank's claims.  As discussed more fully above, the proved producing revenue from existing wells securing Blank's claims is insufficient to pay the full amount of his claim.[61]  Also, the proved behind pipe revenue in addition to the proved producing revenue is still insufficient to pay the full amount of the claim.  To provide additional revenue, the debtor proposes to drill the ST 76 sidetrack well, probably not until 2007, and use revenue generated by the sidetrack to fund the Plan, and to

---

[58]  *Id.*

[59]  *Id., citing In re Lakeside Global II. Ltd.*, 116 B.R. 499, 508 n. 20 (Bankr. S.D. Tex. 1989).

[60]  *S & P, Inc. v. Pfeifer*, 189 B.R. 173, 183 (N.D. Ind. 1995).

[61]  Exhibits D-2, 3, 6, 14, 25.

-24-

repay drilling costs to EnerQuest.  The risk is that this drilling will be substantially more expensive than the debtor's cost estimates predict, and may ultimately prove fruitless if the well cannot be drilled or if it is nonproducing.  This risk affects creditors, since it is they who bear the risk of nonpayment and they who will not be paid while drilling costs are recovered.  To base a plan upon such an occurrence is too slim a reed to satisfy the feasibility requirement.  Instead, it tilts the balance too close to a visionary scheme that cannot satisfy the requirements for confirmation.

As discussed above, according to the far greater weight of the evidence, the ST 76 sidetrack well is fraught with risk.  Thus, the debtor has failed to prove by a preponderance of evidence that it will be able to fund the payments required by the Plan and its future operations.  The court finds that the projections of future revenue, especially revenue from proved undeveloped reserves, are not reliable enough.  The debtor has thus failed to demonstrate by a preponderance of the evidence that a reasonable probability of success exists or that the debtor can realistically carry out its plan, at least as to payment in full of Blank's secured claim as called for under the terms of the Plan.  For those reasons, the court holds that the Plan is not feasible.

This Plan, though not confirmable in its present form, does not reflect a hopeless case for reorganization.  If further concessions or modifications can be made by the plan proponents to the objections of Blank that are dealt with in this opinion, the court will entertain a future plan by the debtor or by other proponents.  In other words, the court is not convinced at this time either that this was a hopeless case for reorganization when filed or that the case is now destined for unavoidable dismissal or conversion to a liquidation under Chapter 7.  The case is just a little over a year old. There are substantial assets and the market value of the oil and gas assets increased from the January

1, 2005 figures to the date of the confirmation hearing and are continuing to increase.[62]   With a little give and take on the part of the opposing parties in this case, a plan capable of confirmation should be developed.  Because the court has determined that the Plan, in its present incarnation, is not feasible and fails to satisfy the cram down standards as to Blank's secured claim, it is not necessary to discuss other objections made to the Plan.  An appropriate order will be entered denying confirmation.

New Orleans, Louisiana, July 28, 2005.

Jerry A. Brown
U.S. Bankruptcy Judge

---

[62]  Compare the January, 2005 figures to the most recent quote of prices:

|  | Jan. 1, 2005 | July 27, 2005 |
|---|---|---|
| Oil per barrel: | $41.60 | $59.50 |
| Gas  - MCF: | 6.875 | 7.52 |