**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN RE:** | **CHAPTER 11** |
| **FORTUNE NATURAL** | **NO. 04-14112** |
| **RESOURCES CORPORATION** | **SECTION B** |

## REASONS FOR DECISION

Before the court is the objection of the Unsecured Creditors' Committee ("UCC") and others[1] to the pre-petition claim of Greenwich Legal Associates, LLC ("Greenwich") in the amount of $300,000.[2] The UCC objects on two related grounds, asserting that Greenwich is both an attorney of the debtor and an insider of the debtor, and is thus entitled to a claim equivalent only to the reasonable value of the services it provided to the debtor, not the full $300,000. Section 502(b) of the Bankruptcy Code provides that "if . . . objection to a claim is made, the court . . . shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim except to the extent that . . . (4) if such claim is

---

[1] Also objecting are the Distribution Trustee, Sundown Energy, Inc., Barry Blank, and the Barry Blank Living Trust.

[2] The debtor's original schedule of creditors holding unsecured nonpriorty claims, filed on July 16, 2004, listed "Lacoff Associates" as a creditor holding a claim of "0.00." The debtor amended this schedule on August 10, 2004, to list a claim in the amount of $300,000. The schedule was further amended on September 29, 2004, when "Lacoff Associates" was replaced by "Greenwich Legal Associates, L.L.C." On March 27, 2006, the court, solely for the purpose of voting on the debtor's plan of reorganization, estimated Greenwhich's claim to be $40,000.

for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services."[3]

I.

Greenwich's claim arises from a Business and Management Consulting Agreement, dated as of February 4, 2004, between the debtor and Lacoff Associates, LLC (the "Agreement") under which Lacoff Associates agreed "to make its representatives available to consult with [the debtor's] board of directors . . . concerning matters relating to proposed business combinations or transactions, tax statutes and regulations and the use of net operating loss carryforwards, and general matters of importance concerning the business and financial affairs of . . ." the debtor. The agreement specifically excepted "any . . . services normally performed by public accounts [sic]." For this, Lacoff Associates was to be paid a monthly fee of $75,000 plus expenses. The agreement was "amended," supposedly on May 1, 2004, to assign Lacoff Associates' "rights, duties, and obligations" under the agreement to Greenwich.

Both Lacoff Associates and Greenwich are Connecticut limited liability companies.[4] Brandon Lacoff and Lacoff Associates are the only two members of

---

[3] 11 U.S.C. § 502(b).

[4] *See* Greenwich Exhibit 2 (Articles of Organization of Lacoff Associates, LLC and amendments thereto); Greenwhich Exhibit 3 (Articles of Organization of Greenwich Legal Associates, LLC and amendments thereto).

2

Greenwich.[5] Brandon Lacoff is Lacoff Associates' sole member.[6] Brandon Lacoff is both an attorney and an accountant, and is the son of Martin Lacoff, a director of the debtor.

## II.

The UCC bases its objection on its assertion that Greenwich is an insider or an attorney of the debtor. If it is either, Greenwich is entitled only to a claim equivalent to the reasonable value of its services under section 502.[7] The UCC asserts that Greenwich is an insider; Greenwich asserts that it falls outside the definition.[8]

## A.

---

[5] Greenwhich was formed on June 30, 2003, at which time Brandon Lacoff was its sole member. On April 6, 2004, notice of the addition of Lacoff Associates as a member of Greenwhich was filed with the Connecticut Secretary of State. Greenwich's annual report, filed on July 6, 2004, lists only two members: Brandon Lacoff and Lacoff Associates.

[6] *See* Tr. I at 225; Tr. II at 54; Findings of Fact Proposed by the UCC at ¶ 15. Initially, there was some confusion about the composition of Lacoff Associates. The Articles of Organization of Lacoff Associates, filed on May 23, 2003, with the Connecticut Secretary of State, list Brandon Lacoff as Lacoff Associates' sole member. An "Interim Notice of Change of Member/Manager," filed on April 6, 2004, reported that Martin Lacoff had ceased to be a member. The debtor asserts that the April 2004 was made in error, that Martin Lacoff has "never had an interest in Lacoff Associates," and that Lacoff Associates has never had any member other than Brandon Lacoff. Debtor's Response at 6.

[7] *See* 11 U.S.C. § 502(b).

[8] Response to Unsecured Creditors Committee's Objection to Pre-petition Claim of Grenwich Legal Associates, LLC (hereinafter "Greenwich Response") at ¶ 16.

3

Bankruptcy Code section 101(31) lists certain specific categories of insiders, but the list is not exclusive. Indeed, "[b]ankrupcty law recognizes two types of insiders: those specifically identified in § 101(31), commonly referred to as 'per se' insiders, and those not so identified but who have a sufficiently close relationship with the debtor to be insiders, commonly referred to as 'non-statutory' insiders."[9]

Under section 101(31) an "insider" of a corporation "includes" the following: "(i) [a] director of the debtor; (ii) [an] officer of the debtor; (iii) [a] person in control of the debtor; . . . or (vi) [a] relative of a . . . director, officer, or person in control of the debtor."[10] A "relative," in turn, is an "individual related by affinity or consanguinuity within the third degree."[11] Both Martin and Brandon Lacoff are "statutory" insiders of the debtor (Martin because he is a director and Brandon because he is Martin's son) but Greenwich is not.

Again, however, the fact that Greenwhich does not fit squarely within any of the five types of corporate insiders explicitly denoted in section 101(31) does not pretermit the inquiry, for section 101(31) sets forth only a non-exclusive list,

---

[9] *Miller Ave. Prof'l and Promotional Servs., Inc. v. Brady (In re Enterprise Acquisition Partners)*, 319 B.R. 626, 629 (B.A.P. 9th Cir. 2004).

[10] 11 U.S.C. § 101(31).

[11] 11 U.S.C. § 101(45).

4

providing examples of what the term insider "includes."[12] "'[I]ncludes' . . . [is] not limiting."[13] Indeed, when Brandon Lacoff is without question an insider of the debtor, it would be both folly and a triumph of form over substance to hold that the LLC over which Brandon exerts complete control is not an insider. Certainly Congress' reasons for requiring heightened scrutiny for certain individuals apply with equal force to entities entirely controlled by such individuals. To hold otherwise would be to eviscerate this section of the code by inviting insiders to escape judicial scrutiny simply by incorporating themselves.

Beyond the Code's explicit or per se insiders, "insider status may be based on a professional or business relationship with the debtor, . . . where such relationship with the debtor [is] close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties."[14] The idea that affinity between two entities might lead to a skewed course of dealing was not too far from Congress' collective mind, according to which "[a]n insider is one who has a sufficiently close relationship with the debtor

---

[12] See Wilson v. Huffman (In re Missionary Baptist Foundation), 712 F.2d 206, 210 (5th Cir. 1983) ("Use of the word 'includes' in § 101([31]) evidences Congress' expansive view of the scope of the insider class, suggesting that that statutory definition is not limiting and must be flexibly applied on a case-by-case basis.") See also Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman), 126 B.R. 63, 69 (B.A.P. 9th Cir. 1991) ("The use of the word 'includes' is indicative of Congress' intent not to limit the classification of insiders to the statutory definition.)

[13] 11 U.S.C. § 102(3).

[14] *Friedman*, 126 B.R. at 70.

5

that his conduct is made subject to closer scrutiny than those dealing at arm[']s length with the debtor."[15] Presumably, in enacting section 502 (which calls for a court to scrutinize insider claims for reasonableness), Congress was generally leery of the advantages an insider-creditor of a debtor may enjoy over outsider-creditors simply by virtue of being an insider. These advantages stem from the understandable tendency of a debtor to favor creditors close to it. Outsider-creditors are disadvantaged to the extent that the insider-creditors are able to recover disproportionately on an excessive claim. To be sure, a claim is unreasonably excessive in the first place presumably because of the creditor's insider status. A debtor's general favoritism toward an insider may cause the debtor to behave in an economically irrational way, agreeing to pay an unreasonable amount for the insider's services or goods. Indeed, "insider transactions [are] less vulnerable to the market pressures that help control arm's-length transactions."[16] When a creditor is not an insider, market forces will be unhindered, and there is then less likelihood that a creditor's claim will exceed the reasonable value of its services to the debtor; ergo, there is less of a need for a court to scrutinize the reasonableness of a claim.

---

[15] S. Rep. No. 95-989, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.C.A.A.N. 5787, 5810.

[16] Note, "The Term Insider within section 547(b)(4)(B) of the Bankruptcy Code," 57 *Notre Dame Laywer* 726, 729-30 (1982). Section 547(b) of course deals with the avoidance of preferential transfers and not disputes on claims. The difference with the present situation, however, is immaterial. The economic considerations are the same.

6

Greenwich is certainly close enough to Fortune to raise the prospect that dealings between the two entities might be significantly influenced by affinity instead of rational market forces. This closeness merits the court's scrutiny to determine whether the claim arising out of the entities' dealings is reasonable. That scrutiny convinces the court that the insider status of Brandon resulted in an extremely favorable contract for the son's LLC suggested by his father, Martin Lacoff, the managing individual of the debtor.

B.

The essential dispute is over the reasonable value of the services provided by Greenwich to Fortune. Greenwich claims that $300,000 is reasonable, whereas the UCC and its affiliate objectors claim that the services provided by Greenwich reasonably merit no compensation, that they were valueless. It is important to note at the outset that section 502 does not prohibit altogether claims of insiders, it only requires that those claims be reasonable. Greenwich's services were certainly not valueless, nor, however, were they worth $300,000.

In order to determine the reasonableness of the Greenwich fee, it is necessary to examine carefully exactly what Greenwich claims it did or would do. The Agreement itself is vague, but, to be sure, Greenwich was retained to advise Fortune how best to deal with the "perilous" financial difficulty it faced. Greenwich's services centered, in the main, around advising Fortune and potential transaction partners on the structuring of a sale of Fortune's net operating losses, which could offer a potential tax advantage to the right entity. Although there

were ancillary services, Greenwich's primary work product was a roadmap of potential transactions which would allow Fortune to transfer its net operating losses to a purchasing entity.[17] In addition to the roadmap, Greenwich also contacted several entities to gauge those entities' interest in proceeding with the proposed transaction.[18] In Brandon Lacoff's own words, he "took the idea of the [net operating losses], presented it to [potential transaction partners], explained to them the [net operating losses], how it could be used, what's the pitfalls, and they took it from there and they talked to their advisors, and then I spoke to their advisors at a later date."[19] For this service, Greenwich seeks to be paid $300,000, representing four months' work. (The Agreement sets forth that Greenwich was to be paid a fixed monthly retainer of $75,000.)

Greenwich's only principal, indeed its only employee at all, Brandon Lacoff, had at best, at the time of his engagement by Fortune, very limited general experience as a management consultant or investment banker.[20] In fact, it is not clear from the record that Brandon Lacoff had any independent experience in providing consulting or banking services: he was, at best, a moonlighting consultant, employed full time in junior positions at Arthur Andersen and Ernst &

---

[17] Tr. I at 28-29, 141-142, 181; Tr. II at 121-22.

[18] Tr. I at 246; Tr. II at 42.

[19] Tr. II at 123.

[20] Tr. I at 71; Tr. II at 122-23.

8

Young as part of a team of professionals providing tax advice with respect to business combination transactions.[21] He had no experience in the oil and gas industry in which Fortune had been engaged.[22] The level of Mr. Lacoff's experience is, of course, important in determining what he may reasonably charge for his services. The fees for the type of services provided by Mr. Lacoff that may reasonably be charged by a large and well-established Wall Street firm with its attendant institutional resources and reputational goodwill will be quite different than those that Mr. Lacoff may reasonably charge as a solo, after-hours practitioner with, at best, only a handful of years of experience and no particularly significant experience within the oil and gas industry.[23]

In addition to Mr. Lacoff's relative inexperience, one must also consider the time and energy he was devoting to projects other than Fortune. Indeed, he was working full time at Ernst & Young, typically working there ten hours each weekday, and up to eighty hours per week.[24] This is not all: Mr. Lacoff also maintained a small real estate investment business in Connecticut.[25]

---

[21] Tr. I at 114.

[22] Tr. II at 126.

[23] *See* Tr. I at 71.

[24] Tr. II at 45, 51-52.

[25] Tr. II at 54-58.

9

The circumstances surrounding Mr. Lacoff's hiring bespeak an insider arrangement. The simple fact that Martin Lacoff, a director of Fortune, is Brandon's father is enough to arouse exceedingly strong suspicion that an insider deal was struck.[26] Martin also proposed his son's employment[27], and, while there were apparently several discussions about hiring Brandon, the ultimate decision was made by the board of directors at a meeting in which Martin participated.[28] Even though Martin ultimately abstained from voting on the matter, his presence at the meeting during which the board decided to hire his son is a textbook example of poor corporate governance. Martin should have not only abstained, but should have excused himself altogether from this part of the meeting. Apart from Martin's presence at the meeting, the board was less than diligent in negotiating the contract with Lacoff Associates. In fact, there was no negotiation at all. According to the testimony of Mr. Drulias, the seventy-five thousand dollars per month fee that Lacoff Associates was to be paid was proposed by Brandon and accepted without question by Mr. Drulias and, later, the board.[29]

---

[26] Martin Lacoff was not simply a director. He was much more deeply involved in executive decisions concerning the management of Fortune's business than his title would suggest. Tr. III at 143.

[27] Tr. I at 24; Tr, III at 64.

[28] Tr. I at 25-27.

[29] Tr. I at 27.

Finally, Mr. Drulias's actions in reducing the agreement between Brandon and Fortune to writing arouse a not insignificant amount of suspicion that the deal's benefit to Brandon was more of a concern that was the deal's benefit to the company or, certainly, its creditors. Indeed, while the "effective date" of the amendment to the Agreement transferring the rights and obligations of Lacoff Associates to Greenwich is May 1, 2004, the evidence suggests that this amendment may not have been executed until after Fortune's chapter 11 petition, which was filed on June 1, 2004.[30]

The facts lead the court to one conclusion: that Greenwich has to be treated as an insider of the debtor. As such, pursuant to section 502(b) of the Bankruptcy Code, Greenwich is entitled only to a reasonable fee for the services it provided to Fortune.

---

[30] Tr. I at 79. All the evidence shows that the amendment was signed some time after its effective date of May 1, 2004. *See*, *e.g.*, Tr. I at 101 ("THE COURT: . . . [A]s to the amendment, is it your testimony that that was also signed by both parties on the 1st day of May, which is the stated date? [MR. DRULIAS]: No, I don't believe that was signed [on] the 1st day of May. I made it effective the 1st day of May just for purposes of keeping the accounting straight. But, my recollection is it was prepared and signed at some time after that prior to the filing [of Fortune's bankruptcy petition].")

Mr. Drulias and Brandon were both firm in their testimony that the amendment was signed before June 1, 2004. *See* Tr. I at 101; Tr. II at 68-69. Nevertheless, the court finds it is more that passing strange that Drulias testified that the first time he met Brandon in person was in June 2004 in New York, New York, Tr. I at 77, and that a "modification" was signed by Mr. Drulias on June 8, 2004, after the filing of Fortune's petition. *See* UCC Exhibit 30 (e-mail from Martin Lacoff to M.J. King at Fortune, dated June 6, 2004, directing King to e-mail the "May modification" so that he (Martin) could " . . . give it to Brandon to have Dean [Drulias] sign on Tuesday [June 8, 2004]).

11

At the hearing on the present issue, Greenwich presented the testimony of its expert, Michael Hammer. Mr. Hammer, who is the sole principal in his own investment banking firm, Ponchartrain Capital, testified that the $75,000 per month fee was not "astronomical,"[31] and that a fee in a situation such as this should be viewed in relation to the precarious financial situation of Fortune at the time it engaged Greenwich's services.[32] Mr. Hammer testified that "the risk and the complexity of this transaction deserves a big fee," and that Mr. Hammer himself, who has two decades of experience in the financial services industry, may have charged "maybe a half million dollars because ultimately it was destined that the company would go through a bankruptcy."[33] Indeed Mr. Hammer's justification for the fee charged by Greenwich seems largely to hang on the degree of risk that Greenwich undertook when it agreed to provide its services to Fortune—presumably the risk that it would not be paid at all. Importantly, Mr. Hammer testified that his $500,000 figure was not a retainer of the type set forth in the Agreement at issue, but rather was a fee based on the ultimate success of a transaction, though he did not elaborate on how such a fee would be determined—that is, whether Mr. Hammer's hypothetical fee would be based upon a percentage of Fortune's proceeds, or upon some calculation of the economic risk that an advisor to Fortune would face at the beginning of an engagement. Mr. Hammer

---

[31] Tr. IV at 115.

[32] Tr. IV at 123-24.

[33] Tr. IV at 123.

12

testified that he typically charges a retainer of $10,000 to $25,000 when his firm's services are engaged.[34]

The UCC countered Mr. Hammer's testimony with that of its own expert, Stanley Ellington, the manager of the corporate finance department of Hibernia Southcoast Capital, a New Orleans based investment banking firm.[35] Mr. Ellington testified that "the size of the retainer fee, the monthly fee, $75,000 for a company that is teetering on bankruptcy, is extraordinarily high", and indeed that there is "no basis for that fee at all."[36] Mr. Ellington further testified that the upper limit for a retainer fee in bankruptcy situations would be a one-time payment of $25,000, "particularly for someone with the limited experience and extraordinarily limited staff of" Greenwich.[37] This is certainly a far cry from the $75,000 per month fixed retainer that Greenwich is attempting to justify in these proceedings. Mr. Ellington also testified to the quality of Greenwich's work product, which he said was "surprising and disappointing" in its presentation.[38]

---

[34] Tr. IV at 165-66.

[35] Tr. II at 141.

[36] Tr. II at 146.

[37] Tr. II at 146. Indeed, Mr. Ellington was of the opinion that the payment of a fixed, monthly retainer fee for the furnishing of investment banking services is not the most common type of fee arrangement. Rather, investment banks are more commonly paid a fee based upon the successful completion of the deal on which they are advising. Tr. II at 147; Tr. IV at 17, 20, 41.

[38] Tr. II at 152-53.

13

The experts' testimony is hardly in counterpoise. To a very large extent, Mr. Hammer's—and Greenwich's—argument justifying the $300,000 fee rests upon the risk that Greenwich would not be paid at all. However, Mr. Hammer's own practice, according to his testimony, would not be to hedge that risk by charging a $75,000 monthly retainer. Instead, he would charge a much smaller retainer—no more than $25,000—and then a larger fee only if his client completed a successful transaction.

Based on the testimony of the experts, and with more weight given to the particularly convincing testimony of Mr. Ellington, the court finds that $25,000 is a reasonable retainer for the type of services contemplated by the Agreement and provided by Greenwich to Fortune.

III.

In conclusion, because the court finds that Greenwich is an insider of the debtor, it is entitled, under section 502(b), to claim against the estate only the reasonable value of its services. For the foregoing reasons, the court sustains the UCC's objection in part and reduces Greenwich's claim by the amount which exceeds the reasonable value of Greenwich's services. The court sets Greenwich's claim at $25,000.

New Orleans, Louisiana, September 28, 2006.

*J. A. Brown*
_____
UNITED STATES BANKRUPTCY JUDGE